☐ Original ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*
Three Apple iPhones (Devices A, B, & C) located at North Central HIDTA (11548 W. Theo Trecker Way, West Allis, Wisconsin), further described in Attachment A

Case No. 26-833M(NJ)

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the Eastern District of Wisconsin *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B

**YOU ARE COMMANDED** to execute this warrant on or before 1/29/2026 *(not to exceed 14 days)*

☐ in the daytime 6:00 a.m. to 10:00 p.m. ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to Hon. Nancy Joseph.
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for ____ days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of ________.

Date and time issued: 1/15/2026 @ 3:09 p.m.

Nancy Joseph
*Judge's signature*

City and state: Milwaukee, Wisconsin

Nancy Joseph, U.S. Magistrate Judge
*Printed name and title*

**Return**

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: ________________

*Executing officer's signature*

*Printed name and title*

## ATTACHMENT A

**Property to Be Searched**

1. The property to be searched is described as follows:

   a. A black Apple iPhone smartphone with a blue & black protective case, hereinafter referred to as "**Device A**" that was seized on January 14, 2026 from GONZALEZ's residence (738 S. 23rd Street);

   b. A black Apple iPhone smartphone with a red protective case, hereinafter referred to as "**Device B**" that was seized on January 14, 2026 from GONZALEZ's residence (738 S. 23rd Street); and

   c. A black Apple iPhone smartphone (no case) with a sticker on the back with a handwritten note, "414)293-7395" hereinafter referred to as "**Device C"** that was seized from GONZALEZ's person on January 14, 2026 following his arrest in the area of GONZALEZ's residence (738 S. 23rd Street)

**Devices A, B,** and **C**, collectively referred to herein as the "**Devices**," are currently located at 11548 W. Theo Trecker Way, West Allis, Wisconsin. This warrant authorizes the forensic examination of the **Devices** for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1. All records on the **Devices,** further described in Attachment A, that relate to violations of 21 U.S.C. §§ 846, 843(b), and 841(a)(1), and 18 U.S.C., §§ 922(g) and 924(c), and involve Miguel GONZALEZ, including, but not limited to:

a. any documents and communications related to the Target Offenses;

b. lists of contacts and related identifying information;

c. types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

d. any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

e. any information related to criminal activity and co-conspirators (including names, addresses, phone numbers, or any other identifying information);

f. any information recording GONZALEZ's schedule or travel;

g. all bank records, checks, credit card bills, account information, and other financial records relevant to the acquisition, sale and/or trade of firearms, the sale/acquisition of controlled substances and/or drug proceeds;

h. Photographs and/or videos depicting evidence of the Target Offenses;

i. Any evidence related to either the ownership, purchase, or possession of items used in the Target Offenses;

j. Records of Internet activity, including browser history, search terms that the user entered into any Internet search engine, and records of user-typed web addresses

k. types, amounts, and prices of firearm transactions, as well as dates, places, and amounts of specific transactions;

l. any information related to the source(s) of firearms (including names, addresses, phone numbers, or any other identifying information);

m. any information related to GONZALEZ's acquisition, receipt, or possession of firearms during the time he has been prohibited by federal law from possessing firearms;

n. text messages, social media messages and content, SMS messages, iMessage data, relating to the acquisition, sale and/or trade of firearms and/or controlled substances; and

o. electronic mail to include the content of the emails, and associated email addresses, relating to the acquisition, sale and/or trade of firearms and/or controlled substances;

2. Evidence of user attribution showing who used or owned the **Devices** at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the HSI/HIDTA may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

Three Apple iPhones (Devices A, B, & C) located at North Central HIDTA (11548 W. Theo Trecker Way, West Allis, Wisconsin), further described in Attachment A

Case No. 26-833M(NJ)

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the Eastern District of Wisconsin, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. §§ 841(a)(1), 843(b), & 846; 18 U.S.C. §§ 924(c) and 922(g) | Distribution/Possession with Intent to Distribute Controlled Substances; Conspiracy to Distribute Controlled Substances; Use of a Communication Facility in Furtherance of a Drug Trafficking Offense; Possession of a Firearm in Furtherance of Drug Trafficking; & Possession of a Firearm by a Prohibited Person; |

The application is based on these facts:

See attached Affidavit

☑ Continued on the attached sheet.

☑ Delayed notice of 30 days *(give exact ending date if more than 30 days:* ________ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

JOSEPH L ESQUEDA Digitally signed by JOSEPH L ESQUEDA Date: 2026.01.14 18:31:08 -06'00'

*Applicant's signature*

Joseph Esqueda, HSI TFO

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone *(specify reliable electronic means)*.

Date: 1/15/2026

*Judge's signature*

City and state: Milwaukee, Wisconsin

Nancy Joseph, U.S. Magistate Judge

*Printed name and title*

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR SEARCH WARRANT**

I, Joseph ESQUEDA, being first duly sworn on oath, on information and belief state:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—electronic devices—which are currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2. I am a Police Officer with the Milwaukee Police Department (WI) and a Federally Deputized Task Force Officer with Homeland Security Investigations ("HSI") assigned to the Homeland Security Task Force ("HSTF"). I am also assigned to the North Central High Intensity Drug Trafficking Area (HIDTA) – Interdiction Initiative as a drug detection K9 handler and partnered with K9 "GHOST." I have been employed as a full-time law enforcement officer for over twenty (20) years.

3. As Police Officer and Task Force Officer, I have participated in the investigation of gang and narcotics related offenses, resulting in the seizure of illegal drugs, weapons, United States currency, and other evidence of criminal activity. As an investigator, I have interviewed many individuals involved in drug trafficking and gang activity, and have obtained information from them about the acquisition, sale, importation, manufacture, and distribution of controlled substances. Through my training and experience, I am familiar with the actions, habits, traits, methods, and terminology used by the drug traffickers, gang members, and abusers of controlled substances. I have participated in all aspects of drug and gang investigations, including physical surveillance, execution of search warrants, court-ordered wiretaps, analysis of phone and financial

records, and the arrests of drug traffickers. I have also been the affiant and participated in the preparation and execution of drug and gang-related search warrants. Additionally, I have spoken with other experienced drug investigators on numerous occasions concerning the method and practices of drug traffickers and money launderers. Through these investigations, my training and experience, and conversations with other law enforcement personnel, I have become familiar with the methods used by drug traffickers and gang members to manufacture, smuggle, safeguard, and distribute narcotics and firearms, and to collect and launder trafficking-derived proceeds. In addition to my experience in the investigation of individuals involved in federal criminal offenses, I also have knowledge and experience in the apprehension and prosecution of individuals involved in federal criminal offenses. I am familiar with and have experience in the use of cellular devices used to commit those offenses as well as the available technology that can be used by law enforcement to assist in identifying the users of cellular devices and their locations.

4. I have participated in numerous complex narcotics investigations which involved violations of state and federal controlled substances laws including Title 21, United States Code, Sections 841(a)(1) and 846 (possession with intent to distribute a controlled substance and conspiracy to possess with intent to distribute a controlled substance), and other related offenses. I have had both formal training and have participated in numerous complex drug trafficking investigations, including ones using wiretaps.

5. As a part of my duties, I investigate criminal violations relating to narcotics trafficking offenses, including violations of Title 21, United States Code, Sections 841, 843, and 846, and federal firearms offenses, including violations of Title 18, United States Code, Sections 922(g), 924(a), and 924(c). In the course of my experience, I have and continued to be involved in investigations of criminal offenses and have assisted with search warrants for items related to gang

investigations, organized crime, violent crime, firearms offenses, drug trafficking, including cellular telephones and other electronic telecommunication devices.

6. I have had formal training in the investigation of drug trafficking. I have worked with informants in the investigation of drug trafficking. I have participated in the execution of numerous search warrants in which controlled substances, firearms, drug paraphernalia, and monies were seized.

7. I have participated in numerous complex narcotics investigations which involved violations of state and federal controlled substances laws including Title 21, United States Code, Sections 841(a)(1), 843(b), and 846 (manufacture, distribute, and possess with intent to distribute a controlled substance, use of a communication facility to commit a felony drug crime, and conspiracy to do the same), and other related offenses. More specifically, my training and experience includes the following:

a. I have used informants to investigate drug trafficking. Through informant interviews, and extensive debriefings of individuals involved in drug trafficking, I have learned about the manner in which individuals and organizations distribute controlled substances in Wisconsin and throughout the United States;

b. I have also relied upon informants to obtain controlled substances from drug traffickers, and have made undercover purchases of controlled substances;

c. I have participated in several search warrants where controlled substances, drug paraphernalia, and drug trafficking records were seized;

d. I am familiar with the appearance and street names of various drugs, including marijuana, heroin, cocaine, cocaine base (unless otherwise noted, all references to crack cocaine in this affidavit is cocaine base in the form of crack cocaine), ecstasy, and methamphetamine. I am familiar with the methods used by drug traffickers to package and prepare controlled substances for sale. I know the street values of different quantities of the various controlled substances;

e. I am familiar with the language utilized over the telephone to discuss drug trafficking, and know that the language is often limited, guarded, and coded;

f. I know that drug traffickers often use electronic equipment and wireless and land line telephones to conduct drug trafficking operations;

g. I know that drug traffickers commonly have in their possession, and at their residences and other storage locations where they exercise dominion and control, firearms, ammunition, and records or receipts pertaining to such;

h. I know that drug traffickers often use drug proceeds to purchase assets such as vehicles, property, and jewelry. I also know that drug traffickers often use nominees to purchase or title these assets to avoid scrutiny from law enforcement officials;

i. I know large-scale drug traffickers often purchase or title their assets in fictitious names, aliases, or the names of relatives, associates, or business entities to avoid detection of these assets by government agencies. I know that even though these assets are in names other than the drug traffickers, the drug traffickers actually own and continue to use these assets and exercise dominion and control over them;

j. I know large-scale drug traffickers maintain on-hand large amounts of U.S. currency to maintain and finance their ongoing drug business;

k. I know it is common for drug traffickers to maintain books, records, receipts, notes, ledgers, airline tickets, and receipts relating to the purchase of financial instruments, and/or the transfer of funds and other papers relating to the transportation, ordering, sale, and distribution of controlled substances. I also know that the aforementioned books, records, receipts, notes, ledgers, etc. are maintained where the traffickers have ready access to them;

l. I know it is common for large-scale drug traffickers to secrete contraband, proceeds of drug sales, and records of drug transactions in secure locations within their residences, their businesses, storage facilities, or other locations over which they maintain dominion and control, for ready access and to conceal these items from law enforcement authorities or rival drug traffickers. These secure locations include, but are not limited to safes, briefcases, purses, locked filing cabinets, and hidden storage areas in natural voids of a residence;

m. I know it is common for persons involved in large-scale drug trafficking to maintain evidence pertaining to their obtaining, secreting, transferring, concealing, and/or expenditure of drug proceeds, such as currency, financial instruments, precious metals and gemstones, jewelry, books, records of real estate transactions, bank statements and records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, safe deposit box keys, and money wrappers. These items are maintained by the traffickers within residences (including attached and unattached garages), businesses, or other locations over which they maintain dominion and control;

n. I know large-scale drug traffickers often use electronic equipment such as telephones (land-lines and cell phones), computers, telex machines, facsimile machines, currency counting machines, and telephone answering machines to generate, transfer, count, record or store the information described in the items above, as well as conduct drug trafficking activities;

o. I know when drug traffickers amass large proceeds from the sale of drugs, the drug traffickers attempt to legitimize these profits through money laundering activities. To accomplish these goals, drug traffickers utilize the following methods, including, but not limited to: domestic and international banks and their attendant services, securities brokers, professionals such as attorneys and accountants, casinos, real estate, shell corporations and business fronts, and otherwise legitimate businesses that generate large quantities of currency;

p. I know drug traffickers commonly maintain addresses or telephone numbers in books or papers that reflect names, addresses, and/or telephone numbers of their associates in the trafficking organization; and

q. I know drug traffickers take (or cause to be taken) and maintain photographs of themselves, their associates, their property, and their drugs.

8. I have participated in several narcotics and firearms trafficking investigations that involved the seizure of computers, cellular phones, cameras, and other digital storage devices, and the subsequent analysis of electronic data stored within these computers, cellular phones, cameras, and other digital storage devices. On many occasions, this electronic data has provided evidence of the crimes being investigated and corroborated information already known or suspected by law enforcement.

9. Based upon my training and experience, I know that computer hardware and software may be important to a criminal investigation in two distinct and important respects: (1) the objects themselves may be instrumentalities, fruits, or evidence of crime, and/or (2) the objects may have been used to collect and store information about crimes (in the form of electronic data). Rule 41 of the Federal Rules of Criminal Procedure permits the government to search and seize computer hardware and software that are (1) instrumentalities, fruits, or evidence of crime, or (2) storage devices for information about crime.

10. This affidavit is based upon my personal knowledge, training, and experience, and on information reported to me by other federal, state, and local law enforcement officers during the course of their official duties, all of whom I believe to be truthful and reliable. This affidavit is also based upon official records, witness statements, recorded statements, surveillance video, and public records, which I consider to be reliable as set forth herein.

11. Throughout this affidavit, reference will be made to case agents. Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation.

12. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Sections 841(a)(1) (Distribution and Possession with Intent to Distribute a Controlled Substance) and 846 (Conspiracy to Distribute and Possession with the Intent to Distribute Controlled Substances) have been committed, are being committed, and/or will be committed by Miguel GONZALEZ ("GONZALEZ") (DOB: XX/XX/1995), Fransisco CRESPO-TRINIDAD (CRESPO-TRINIDAD), and others known and unknown.

13. The Court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offenses being investigated; *see* 18 U.S.C. § 2711(3)(A)(i).

**IDENTIFICATION OF THE DEVICES TO BE EXAMINED**

14. The property to be searched is described as follows:

a. A black Apple iPhone smartphone with a blue & black protective case, hereinafter referred to as "**Device A**" that was seized on January 14, 2026 from GONZALEZ's residence (738 S. 23rd Street);

b. A black Apple iPhone smartphone with a red protective case, hereinafter referred to as "**Device B**" that was seized on January 14, 2026 from GONZALEZ's residence (738 S. 23rd Street); and

c. A black Apple iPhone smartphone (no case) with a sticker on the back with a handwritten note, "414)293-7395" hereinafter referred to as "**Device C**" that was seized from GONZALEZ's person on January 14, 2026 following his arrest in the area of GONZALEZ's residence (738 S. 23rd Street)

15. **Devices A, B,** and **C**, collectively referred to herein as the "**Devices**," are currently located at 11548 W. Theo Trecker Way, West Allis, Wisconsin.

16. The applied-for warrant would authorize the forensic examination of the **Devices** for the purpose of identifying electronically stored data more particularly described in Attachment B. I believe that contained within the **Devices** is evidence of GONZALEZ's involvement in violations of 21 U.S.C. §§ 846, 843(b), and 841(a)(1), and 18 U.S.C., §§ 922(g) and 924(c) ("Target Offenses").

## PROBABLE CAUSE

### Seized Parcels

17. On Tuesday, September 30, 2025, Wisconsin State Patrol Trooper Gareth Sedgebeer-Williams and Drug Enforcement Administration (DEA) Task Force Officer (TFO) Robert Gregory responded to a private parcel carrier for random parcel screening. Case agents located two different parcels that were addressed to Thomas Baker of 3021 West Auer Avenue, Milwaukee, Wisconsin. The parcels were sent from Glenair INC of 1211 Air Way, Glendale, California, 91201. Case agents were unable to find a "Thomas Baker" residing at 3021 West Auer

Avenue and believed it to be a fake alias.

18. Trooper Sedgebeer-Williams deployed his trained controlled substance detection K9 (Smoky) on the parcels and Smoky gave a final indication to the odor of controlled substances coming from the parcels. Trooper Sedgebeer-Williams composed a State of Wisconsin search warrant to search the contents of the parcels.

19. Upon the warrants being granted, case agents located approximately 20 pounds of crystal methamphetamine in each parcel (40 pounds of crystal methamphetamine total).

20. Also on September 30, 2025, law enforcement executed a controlled delivery of the seized parcels. The crystal methamphetamine was removed from the parcels and they were filled with "sham," (a substance that is not a controlled substance). An undercover Milwaukee Police Officer delivered both parcels to 3021 West Auer Avenue and placed them on the ground in front of the door. Officers observed a male, later identified as Brandin S. FOUNTAINE (DOB XX/XX/1986), walk to 3021 West Auer Avenue. FOUNTAINE observed both parcels and he ran back to 3002 West Burleigh Street. FOUNTAINE then drove out of 3002 West Burleigh Street in a black pick up truck. FOUNTAINE drove directly to 3021 West Auer Avenue and placed both parcels in the bed of his pick up truck. After FOUNTAINE obtained the parcels, law enforcement conducted a traffic stop of the vehicle and FOUNTAINE was detained.

21. A *Mirandized* Interview was conducted of FOUNTAINE. FOUNTAINE stated that he rents a space within 3021 West Burleigh Street to fix automobiles, but also conducts maintenance work at 3002 West Burleigh Street and 3021 West Auer Avenue. FOUNTAINE stated he was walking his dog when he observed the two parcels at 3021 West Auer Avenue. FOUNTAINE later obtained the parcels and was going to bring them back to 3002 West Burleigh Street and put them in a common area where all delivered parcels go to. FOUNTAINE denied

knowing what was inside of the parcels. FOUNTAINE gave officers consent to download and inspect the contents of his cell phone. FOUNTAINE was later released.

22. Case agents reviewed the data on FOUNTAINE's cell phone. On September 30, 2025, at approximately 10:39AM, FOUNTAINE was texting with "Babezzz" (608-421-4960). FOUNTAINE stated, "The package still isn't here. We are down the block waiting for it me and the Mexican.". With this message being on the same day as the controlled delivery, case agents believe that FOUNTAINE lied to law enforcement and was in fact involved in obtaining the parcels that previously contained crystal methamphetamine.

23. Case agents also found a text message string with Target Cell Phone 1 within FOUNTAINE's cell phone. As it will be explained later in this affidavit, case agents found Target Cell Phone 1 to be utilized by Miguel A. GONZALEZ (DOB 11/19/1995). The contact name was "Twitch" in FOUNTAINE's cell phone. Case agents conducted a check of CashApp for Target Cell Phone 1 and found the CashApp account to be: "Miguel Gonzalez $74senditttt". On June 19, 2025, at approximately 11:46PM, Target Cell Phone 1 (believed to be GONZALEZ) texted FOUNTAINE, "Tell primo I need him active by 8am" and "Get a little rest" and "Its important". Case agents subpoenaed records from the private parcel company from which the two methamphetamine-laden parcels came. Case agents requested a comprehensive list of all parcels that were sent by Glen Air INC from January 1, 2025 to October 7, 2025. Case agents searched for all parcels that were delivered on June 20, 2025. Case agents found that a parcel was delivered to 3100 West Concordia Avenue, Milwaukee, Wisconsin, 53216. 3100 West Concordia Avenue is one block north and one block west of 3021 West Auer Avenue.

24. Based on the text message sent by Target Cell Phone 1 (believed to be GONZALEZ) to FOUNTAINE, along with the delivery of the parcel, case agents believe that

GONZALEZ was telling FOUNTAINE that a parcel was being delivered and that he (FOUNTAINE) and "Primo" would be needed to pick up the parcel.

**Confidential Source Information**

**Confidential Source 1**

25. In October of 2025, case agents were made aware of a confidential source (CS 1) that had information related to this investigation. On Tuesday, October 30, 2025, case agents met with CS 1. CS 1 stated that in July or August of 2023, CS 1 met Anthony M. MITCHEM (white male 01/23/1980) while incarcerated. Case agents showed CS 1 a photograph of MITCHEM and CS 1 positively identified MITCHEM. While in custody, CS 1 and MITCHEM spoke about crystal methamphetamine trafficking. In January of 2024, after being released from custody, MITCHEM called CS 1 about CS 1 obtaining crystal methamphetamine from MITCHEM. That same day, CS 1 drove to Milwaukee and met with MITCHEM at a gas station. CS 1 bought 1 pound of crystal methamphetamine from MITCHEM for $3,000. CS 1 estimated that he purchased anywhere between 3 to 5 pounds of crystal methamphetamine from MITCHEM.

26. While CS 1 was dealing with MITCHEM, MITCHEM introduced CS 1 to MITCHEM's uncle. CS 1 did not know this individual's real name. From case agents' knowledge of this investigation, case agents believed the uncle to be a subject herein referred to as Confidential Source 2 (CS 2). Case agents showed CS 1 a photograph of CS 2 and CS 1 identified CS 2 as CS 1's crystal methamphetamine supplier.

27. According to CS 1: In May or June of 2024, CS 1 was released from a drug treatment program and CS 1 received a phone call from CS 2. They spoke about the sales of crystal methamphetamine and CS 1 agreed to begin buying crystal methamphetamine from CS 2. Shortly

thereafter, CS 1 would travel to Milwaukee once a week to purchase crystal methamphetamine from CS 2.

28. According to CS 1: If CS 1 arrived in Milwaukee during the day, CS 1 would meet CS 2 at a factory building CS 2 managed. From case agents' knowledge of this investigation, case agents knew that CS 2 was associated with 3002 West Burleigh Street. Case agents showed CS 1 a Google Maps photograph of 3002 West Burleigh Street and CS 1 positively identified this as the building where CS 1 would meet CS 2 to purchase the crystal methamphetamine. 3002 West Burleigh Street is the building in which Brandin FOUNTAINE attempted to bring two parcels that previously contained crystal methamphetamine before being detained by law enforcement.

29. CS 1 stated that CS 1 would arrive at the location and CS 2 would open the gate for CS 1 to drive in. CS 1 would drive to a parked camper or RV and stay in the vehicle. CS 2 would go inside of the camper or RV to obtain the crystal methamphetamine. The transaction would occur and CS 1 would immediately leave.

30. Through their criminal relationship, CS 1 estimated that CS 1 purchased one pound of crystal methamphetamine from CS 2 on approximately 20 different occasions. CS 1 purchased five pound quantities on approximately 4 difference occasions. In total, CS 1 stated that CS 1 purchased 40 to 50 pounds of crystal methamphetamine from CS 2. CS 1 further stated that the crystal methamphetamine that CS 1 was arrested with was purchased from CS 2.

31. Beginning in October of 2025, CS 1, made statements against CS 1's penal interest. CS 1 has the following criminal convictions: burglary, operating a vehicle without owner's consent, attempt disarming of a police officer, felony bail jumping, possession with the intent to deliver marijuana, felon in possession of a firearm, possession of controlled substances, and possession with the intent to deliver amphetamine. CS 1 is currently in custody after being charged

with controlled substance trafficking in the Eastern District of Wisconsin. CS 1 has not been promised consideration for providing law enforcement with information on on-going criminal activity. Thus far, the information provided by CS 1 has been corroborated by information known to case agents, as well as other law enforcement officials, gathered during the course of the investigation. More specifically, CS 1's information has been corroborated by seizures of physical evidence. Within the context of the information detailed and relied upon for purposes of this Affidavit, case agents believe CS 1 is credible and CS 1's information reliable.

**Confidential Source 2**

32. Case agents found that CS 2 was currently in custody. Case agents met with CS 2 on two different who provided case agents with information related to this investigation.

33. The following information was derived from an in person debrief of CS 2 in November of 2025. CS 2 stated that in March or April of 2025, CS 2 rented out a portion of a warehouse building located on North 30th Street and West Burleigh Street. TFO Gregory showed CS 2 a photograph of 3002 West Burleigh Street and CS 2 positively identified this as the building in which CS 2 rented a space. 3002 West Burleigh Street is the warehouse building in which FOUNTAINE was bringing the seized crystal methamphetamine parcels to before he was stopped by law enforcement on September 30, 2025. Case agents showed CS 2 a photograph of FOUNTAINE and CS 2 positively identified FOUNTAINE. CS 2 stated that the building is owned by Frank MITCHEM. CS 2 has known Frank MITCHEM CS 2's whole life and considers Frank MITCHEM as a nephew. CS 2's space inside the building was the rear West corner and CS 2 paid Frank Mitchem $1,500 per month. CS 2 was able to give officers the name of other individuals

that rented space within the building: “Cuba”, individuals from Venezuela, “Brett”, “Marco”, and “Miguel”.

34. CS 2 also knew “Miguel” as “Bobby.” CS 2 stated that “Miguel” was CS 2’s crystal methamphetamine supplier. TFO Gregory showed CS 2 a Wisconsin Department of Transportation (WI DOT) photograph of GONZALEZ and CS 2 positively identified GONZALEZ as CS 2’s crystal methamphetamine supplier. CS 2 stated that GONZALEZ’s personal phone number started with “807.” Case agents knows that GONZALEZ’s phone number is 414-807-0753 (Target Cell Phone 1). According to CS 2, GONZALEZ would use other phones that he utilized for controlled substance trafficking and would change phones/phone numbers every month. CS 2 stated that GONZALEZ lives with his child’s mother near the area of South 23rd Street and West National Avenue. Case agents conducted a WI DOT check of GONZALEZ and found his registered address to be 738 South 23rd Street (**Target Residence 1**). This registered address corroborates CS 2’s information. Through law enforcement databases, case agents found that GONZALEZ is romantically involved with Anatalia L. RODRIGUEZ (DOB XX/XX/1989). RODRIGUEZ’s WI DOT registered address is also 738 South 23rd Street (**Target Residence 1**).

35. CS 2 had known GONZALEZ for approximately four years before GONZALEZ had moved into 3002 West Burleigh Street. Shortly after moving into the warehouse, GONZALEZ approached CS 2 and began to ask about CS 2’s open federal case. CS 2 assured GONZALEZ that CS 2 was not cooperating with law enforcement and GONZALEZ inquired with CS 2 if CS 2 knew of individuals that wished to purchase crystal methamphetamine. CS 2 in fact did have associates of Asian descent that wished to purchase crystal methamphetamine. CS 2 knew these individuals as “Asian Boy” and “Fire Boy.” CS 2 believed that “Asian Boy” and “Fire Boy” were

crystal methamphetamine users and street level traffickers that sold the crystal methamphetamine in a "tent city" near North 32nd Street and West Cherry Street.

36. CS 2 then began to fill orders for these individuals through GONZALEZ. For about a month, CS 2 would obtain an ounce of crystal methamphetamine from GONZALEZ and then sell the crystal methamphetamine to the buyers. CS 2 would sell the crystal methamphetamine for $200 and would make $100 of the transaction. Every time that CS 2 would order the crystal methamphetamine from GONZALEZ, GONZALEZ would leave 3002 West Burleigh Street and come back with the crystal methamphetamine shortly thereafter. This made CS 2 believe that GONZALEZ has a stash location nearby. CS 2 further stated that sometimes FOUNTAINE would go and get the crystal methamphetamine and bring it to 3002 West Burleigh Street.

37. The transactions amounts increased from ounces, to multiple ounces, to then even half pounds and full pounds of crystal methamphetamine. CS 2 would sell a half pound of crystal methamphetamine for $1,250 to $1,300 and a full pound for $2,000 to $2,500. CS 2 estimated that CS 2 sold "Asian Boy" and "Fire Boy" 10 to 20 pounds of crystal methamphetamine. All of this crystal methamphetamine was obtained by CS 2 from GONZALEZ.

38. CS 2 was arrested operating a vehicle while intoxicated prior to the seizure of the two methamphetamine-laden parcels discussed above. CS 2 stated that last crystal methamphetamine transaction CS 2 made with "Asian Boy" and "Fire Boy" was one week before CS 2 was arrested and CS 2 sold them one pound of crystal methamphetamine that CS 2 obtained from GONZALEZ.

39. CS 2 stated that CS 2's nephew, Anthony MITCHEM, introduced CS 2 to another crystal methamphetamine trafficker, CS 1. Case agents showed CS 2 a WI DOT photograph of Anthony MITCHEM and CS 2 positively identified Anthony MITCHEM as CS 2's nephew.

Through case agents' knowledge of this investigation, case agents know this to be CS 1. Case agents showed CS 2 a WI DOT photograph of CS 1 and CS 2 positively identified the individual. CS 2 knew that CS 1 was from the Fox Valley area. CS 1 would travel to the Milwaukee area and purchase crystal methamphetamine from CS 2. CS 2 would meet CS 1 in a number of different areas: Potawatomi, 3002 West Burleigh Street, or other areas in Milwaukee. CS 2 further stated that CS 2 knew CS 1 was arrested by police while in possession of crystal methamphetamine. CS 2 stated that days prior to CS 1 being arrested, CS 2 sold CS 1 two pounds of crystal methamphetamine that CS 2 received from GONZALEZ. CS 2 estimated that CS 2 sold crystal methamphetamine to CS 1 on 10 to 15 occasions. All of the crystal methamphetamine sold by CS 2 to CS 1 was supplied by GONZALEZ.

40. CS 2 was then asked how GONZALEZ was obtaining the crystal methamphetamine. CS 2 had first-hand knowledge that GONZALEZ would receive the crystal methamphetamine through the mail from California. CS 2 did not know the company utilized to send the parcels. GONZALEZ would use different addresses to have the parcels sent to. GONZALEZ would commonly have more than one parcel sent at a time. The total sum of the parcels ranged from 20 to 50 pounds. CS 2 estimated that GONZALEZ would receive a shipment once a month or every six weeks. CS 2 stated that if there were two parcels coming to Milwaukee, GONZALEZ would go to one location while FOUNTAINE would go to the other.

41. CS 2 recalled a parcel delivery in the summertime of 2025. CS 2 was present for the delivery and believed it to be in the area of North 47th Street or North 49th Street by West Hampton Avenue. CS 2 remembers the house was by a McDonalds by West Hampton Avenue. Case agents reviewed a map of the area and found a McDonalds on the South West corner of North 49th Street and West Hampton Avenue. CS 2 knows that GONZALEZ has a family member in the

area and GONZALEZ picked an abandoned house in the area to have the parcel sent to. GONZALEZ obtained the package after it was delivered and opened it in front of CS 2. CS 2 stated that the parcel was filled with packing peanuts and there were numerous saran wrapped bundles that each contained one pound of crystal methamphetamine. CS 2 estimated there was 10 pounds of crystal methamphetamine in the parcel. This packaging style is the same in which case agents encountered in the two seized parcels from September 30, 2025.

42. CS 2 stated that GONZALEZ would take frequent trips to California in order to pay his crystal methamphetamine supplier. CS 2 further stated that the supplier would commonly come to Milwaukee and GONZALEZ would have to entertain the individual. When the supplier would come to Milwaukee, GONZALEZ would be frantically collecting money from customers in order to pay the supplier.

43. Investigators conducted a review of Wisconsin Department of Corrections recorded jail call system, ICSOULTIONS, for Target Cell Phone 1. Since CS 2 has been in custody, CS 2 has been in contact with GONZALEZ on Target Cell Phone 1 on seven different occasions between 10/17/2025 and 11/11/2025.

44. Beginning in 2024, CS 2 made statements against CS 2's penal interest's concerning CS 2's federal drug indictment. CS 2 was released from custody and not revoked on CS 2's state supervision despite the federal charges to allow CS 2 to cooperate with law enforcement. CS 2 provided cooperation to federal agents until CS 2 was arrested for operating under the influence and held in custody. CS 2's cooperation included at least one controlled buy of controlled substances and CS 2 providing information concerning drug traffickers in the Milwaukee area. CS 2's information regarding these drug traffickers was credible and, in some cases, independently corroborated by law enforcement. Further, CS 2 provided location

information on a wanted subject that led to that person's arrest. However, during that time, and against CS 2's cooperation agreement, CS 2 became involved in selling methamphetamine to CS 1 and others as recounted above. When confronted with this by case agents following CS 2's arrest, CS 2 admitted to CS 2's conduct and made further statements against CS 2's penal interest concerning CS 2's trafficking of methamphetamine while CS 2 was actively cooperating with law enforcement. Case agents believe that when CS 2 was confronted with case agents' knowledge about CS 2's methamphetamine trafficking CS 2 provided a truthful statement regarding CS 2's involvement in methamphetamine sales. It is possible, however, that CS 2 was involved in *other* unlawful or deceptive conduct while CS 2 was cooperating with law enforcement, and that law enforcement has not yet learned of this additional unlawful or deceptive conduct. On balance, because case agents have corroborated a significant amount of information provided by CS 2 concerning GONZALEZ and CS 2's connection to GONZALEZ, they believe CS 2's information concerning GONZALEZ is accurate and reliable. CS 2 has the following criminal convictions: recklessly endangering safety, burglary, felony bail jumping, escape, possession with the intent to deliver cocaine, and felon in possession of a firearm. CS 2 is currently in custody after being charged with controlled substance trafficking in the Eastern District of Wisconsin and state charges of OWI (1st w/ Passenger < 16 Yrs Old), Operating w/ PAC-Passenger < 16 Yrs, PAC>=0.08, <0.15 (1st), and Neglecting a Child (No Harm and Child < 6 Yrs or Disability). CS 2 has not been promised consideration for providing law enforcement with information on on-going criminal activity. Thus far, the information provided by CS 2 concerning the investigation into RODRIGUEZ has been corroborated by information known to case agents, as well as other law enforcement officials, gathered during the course of the investigation. Within the context of the

information detailed and relied upon for purposes of this Affidavit, case agents believe CS 2 is credible and CS 2's information reliable.

45. Case agents went to the area where CS 2 reported the "tent city" and located several caravans/RVs parked in an area consistent with CS 2's information.

46. Separately, the Drug Enforcement Administration (DEA) conducted a controlled buy operation using CS 3 in the same general area near 32nd Street in Milwaukee, Wisconsin. In sum, within the last 30 days, DEA conducted two controlled buys of crystal methamphetamine from a male of Asian descent (Kue LEE (DOB XX/XX/1981)). The methamphetamine purchased during each operation is believed to be supplied to LEE by GONZALEZ.

47. For several reasons, case agents believe CS 3's information is reliable and that CS 3 is credible. Substantial parts of CS 3's information has been independently corroborated and verified by law enforcement. CS 3 has made direct observations, which were further corroborated and verified by law enforcement. CS 3's information has been consistent with information obtained from telephone toll records, social media records, public databases, and surveillance. CS 3 has also provided information to the Brown County Drug Task Force and the Marinette County Sheriff's Department, which has been verified by law enforcement. CS 3 has prior convictions for theft, possession of controlled substances, battery, and manufacture or deliver controlled substances. CS 3 is cooperating for consideration on open cases for drug-related offenses. Within the context of the information detailed and relied upon for purposes of this Affidavit, case agents believe CS 3 is credible and CS 3's information reliable.

48. On November 19, 2025, Waukesha County Drug Task Force (WCDTF) confidential source (herein CS 3) purchased approximately 472.9 gross grams of suspected methamphetamine, approximately 91.2 gross grams of suspected Fentanyl, and approximately

55.4 gross grams of suspected fentanyl from Kue LEE. As detailed below, I believe that the methamphetamine provided to CS 3 by LEE was supplied to LEE by GONZALEZ.

49. On November 19, 2025, TFO Kopatich and SA Kazamias met with CS 3. TFO Kopatich searched CS 3 and CS 3's vehicle for money, contraband, and controlled substances, with negative results. After the search, TFO Kopatich provided CS 3 with a quantity of Officially Advanced Funds (OAF). Additionally, CS 3 was provided with a live feed audio/video recording device and recording a device was placed in CS 3's vehicle. CS 3 was contacted by LEE and informed that LEE was staying at the Holiday Inn Express. CS 3 was kept under constant surveillance and drove towards the Holiday Inn Express, located at 525 N. Jefferson Street, Milwaukee, Wisconsin. CS 3 parked CS 3's near the Holiday Inn Express and subsequently entered room number 202. LEE and an unidentified female (hereafter referred to as UFM1) were in room 202. While in room 202, CS 3 provided LEE with the buy money for the purchase of the controlled substances as witnessed by TFO Kopatich via live video feed.

50. CS 3, LEE, and UFM1 exited the hotel room, and subsequently entered CS 3's vehicle and departed the area. It should be noted that CS 3 was under constant surveillance as CS 3, LEE, and UFM1 travelled to a residence located at 320 N. 32nd Street, Milwaukee, Wisconsin. CS 3, LEE, and UFM1, parked behind 320 N. 32nd Street, and exited the vehicle. Subsequently, they proceeded to enter a gated area where there was a shed and camper. CS 3 entered the camper. Shortly thereafter, LEE went into a shed near the camper. At one point, CS 3 exited the camper in order to open the gate for three middle-aged Asian males who met with LEE in the shed while CS 3 went back into the camper. A short time later, the three Asian males left after which LEE provided the suspected purple fentanyl to CS 3. During a post operational debrief with CS 3, CS 3 stated that the three Asian males were the ones who delivered the purple fentanyl to LEE. CS 3

further reported that CS 3 has seen the same males deliver the fentanyl to LEE in the past prior to LEE providing the fentanyl to CS 3.While inside the camper, CS 3 waited for the delivery of controlled substances with multiple unidentified individuals, believed to have been customers.

51. TFO Loftus observed a gray Honda Odyssey bearing WI Registration BCD5755 (subject vehicle) arrive at 21st and St. Paul in Milwaukee, Wisconsin. Shortly thereafter, TFO Loftus observed LEE enter the Odyssey (subject vehicle) and depart the area. A Wisconsin Department of Transportation check of the Odyssey (subject vehicle) lists the vehicle to a Rehab Better Home LLC, with a listed address of 155 E. Johnson Street, Fond Du Lac, WI, 54935. Shortly after meeting with the occupant(s) in the Odyssey (subject vehicle), LEE returned to the camper. CS 3 exited the camper, entered CS 3's vehicle, and departed the area. CS 3 was kept under constant surveillance as CS 3 departed the residence and met with case agents at a predetermined meet location. While at the predetermined meet location, TFO Kopatich retrieved four quantities of suspected controlled substances from CS 3. TFO Kopatich searched CS 3 and CS 3's vehicle for money, contraband, and controlled substances, with negative results.

52. Case agents conducted a post-operational debrief with CS 3. During the debrief, CS 3 stated that LEE met with the methamphetamine source of supply in a van (which, in context, I believe to be the subject vehicle) in the area of N. 31st Street and St. Paul Avenue, the same location where TFO Loftus observed LEE entering the Honda Odyssey (subject vehicle). CS 3 stated that CS 3 believed the methamphetamine source of supply to be a Hispanic male. CS 3 stated that LEE returned to the camper with a small box containing two individually wrapped pounds of methamphetamine. According to CS 3, LEE removed one of the pounds to be divided amongst the waiting customers while LEE gave CS 3 the box containing the other pound. CS 3 also stated that LEE had provided CS 3 with the purple fentanyl as well as a small bag of white fentanyl. The CS

also stated that an unidentified subject gave CS 3 a quantity of suspected marijuana. CS 3 stated that prior to leaving, LEE told CS 3 that CS 3 owed LEE $1,400 to be paid at a later time.

53. Case agents reviewed Wisconsin Department of Financial Institutions (WIDFI) records for "Rehab Better Home LLC" and learned that the Registered Agent is Miguel A. GONZALEZ and the principal office is listed as 738 S. 23rd Street, Milwaukee, Wisconsin 53204 (**Target Residence 1**). As detailed above, case agents conducted a WI DOT check of GONZALEZ and found his registered address to be 738 South 23rd Street (**Target Residence 1**). Based on my training and experience, the information provided by CS 1, CS 2, and CS 3, the observations made during the controlled buy with CS 3, and the WIDOT and WIDFI records, I believe that GONZALEZ (or someone operating on GONZALEZ's behalf) delivered two pounds of methamphetamine to LEE inside the Odyssey (subject vehicle).

54. On December 9, 2025, WCDTF CS 3 purchased approximately 260.2 gross grams of suspected methamphetamine and approximately 110.6 gross grams of suspected Fentanyl from Kue LEE. As detailed below, I believe that the methamphetamine provided to CS 3 by LEE was supplied to LEE by GONZALEZ.

55. On December 9, 2025, at approximately 11:40 a.m., SA Kazamias, TFO Kopatich, TFO Loberg, TFO Kropp, and TFO Ronsman (Brown County Task Force) met with CS 3 at the Milwaukee District Office (MDO). At approximately the same time, TFO Loberg searched CS 3 and CS 3's vehicle for money, contraband, and controlled substances, with negative results. Shortly thereafter, TFO Kropp provided CS 3 with $2,350.00 USC in Officially Advanced Funds (OAF). It should be noted that CS 3 was also provided with $1,250.00 USC in Brown County Task Force Funds by TFO Ronsman. In total, CS 3 was provided with $3,600.00 USC in buy funds. Additionally, CS 3 was provided with a live feed audio/video recording device.

56. At approximately 11:55 a.m., CS 3, under constant surveillance, departed the predetermined meet location and drove towards 320 N. 32nd Street, Milwaukee, Wisconsin. Shortly thereafter, at approximately 12:03 p.m., CS 3 arrived at the 320 N. 32nd Street address, exited his/her vehicle, and entered the camper located near the rear of the residence.

57. At approximately 12:08 p.m., CS 3 exited the camper. It should be noted that LEE and an unidentified female (hereafter referred to as UFM2) exited the camper and entered CS 3's vehicle and departed. While under constant surveillance, CS 3, LEE, and UFM2, travelled to a Family Dollar, Gas Station, and Checkers located near the intersection of N. 35th Street and W. Burleigh Street, Milwaukee, Wisconsin.

58. At approximately 12:40 p.m., CS 3, LEE, and UFM2 arrived at the residence located at 2614 W. Burleigh Street, Milwaukee, Wisconsin, and parked in the rear of the residence. Shortly thereafter, CS 3, LEE, and UFM2 exited the vehicle and entered the residence through the rear door.

59. At approximately 1:45 p.m., MPD PO Hermann, who was conducting surveillance at the Good Fellas Barber Shop at 4419 W. Center Street, reported that Pierre SMITH had arrived in a dark vehicle and exited with a large duffle bag that appeared to be heavy. PO Hermann reports seeing SMITH enter the passenger side of a black Maserati with the duffle bag. The Maserati then left the area. At approximately 1:52 p.m., the same black Maserati bearing WI Registration BAV3170 arrived and parked in the front of the 2614 W. Burleigh Street address. Subsequently LEE and CS 3 exited the residence, and LEE entered the rear seat of the Maserati. It should be noted that the CS 3 re-entered the residence.

60. At approximately 1:58 p.m., LEE exited the Maserati and entered the 2614 W. Burleigh residence, subsequently the Maserati departed the area.

61. At approximately 2:35 p.m., CS 3 and LEE exited the residence, and entered CS 3's vehicle, and departed the area. CS 3 and LEE subsequently arrived at the 320 N. 32nd Street address, exited the vehicle, and entered the camper located at the rear of the residence.

62. At approximately 4:35 p.m., CS 3 and LEE exited the camper, entered CS 3's vehicle, and departed the area. Subsequently, CS 3 and LEE arrived on South 20th Street near W. National Street in Milwaukee, Wisconsin.

63. At approximately 4:51 p.m., the Honda Odyssey bearing WI Registration BCD5755 (subject vehicle) arrived on South 20th Street and parked near CS 3 and CS 3's vehicle. LEE exited CS 3's vehicle and entered the Odyssey, then returned to CS 3's vehicle. It should be noted that by this time, the recording equipment provided to CS 3 was no longer recording and the remainder of CS 3's interactions with LEE were not recorded.

64. On December 4, 2025, the Honorable William E. Duffin, Magistrate Judge for the Eastern District of Wisconsin, authorized the installation and monitoring of a Global Positioning System (GPS) tracking device on the Honda Odyssey (subject vehicle). The device was installed shortly thereafter and case agents have monitored the subject vehicle's location since that time.

65. TFO Gregory reviewed GPS data for the subject vehicle. Through investigation, case agents know that GONZALEZ lives at 738 South 23rd Street (Target Residence 1). Case agents conducted physical surveillance of this residence (Target Residence 1) from approximately 10:30AM to 3:30PM on December 9, 2025. Case agents observed the Subject Vehicle parked on

the back parking slab for 738 South 23rd Street (Target Residence 1). The Subject Vehicle did not move from the location during the entirety of the surveillance episode. From reviewing the GPS data, the Subject Vehicle left 738 South 23rd Street (Target Residence 1) at approximately 4:50PM. The Subject Vehicle drove directly to the 700 -block of South 20th Street. The Subject Vehicle was there for approximately four minutes and then returned to the area of 738 South 23rd Street (Target Residence 1). At approximately 5:01PM, the Subject Vehicle left the area of 738 South 23rd Street (Target Residence 1). The Subject Vehicle drove directly to the parking lot attached to 612 South 5th Street. This address is a restaurant named Catrina Café. The Subject Vehicle left shortly after and returned to the back parking slab for 736 South 23rd Street and 738 South 23rd Street (Target Residence 1).

66. Based on TFO GREGORY's training and experience, the GPS data for the Subject Vehicle, and case agents' observations of the timing of the Subject Vehicle's arrival at CS 3's location, TFO GREGORY believe that GONZALEZ departed his residence (738 S. 23rd Street /Target Residence 1) in the Subject Vehicle and met with LEE in the area of South 20th Street to supply LEE with methamphetamine for CS 3.

67. At approximately 4:58 p.m., CS 3 and LEE arrived back at the 320 N. 32nd Street residence. Shortly thereafter, LEE exited the vehicle, and CS 3 departed the area and drove to a pre-determined meet location. It should be noted that CS 3 was under constant surveillance as CS 3 departed the residence and met with case agents at a predetermined meet location.

68. At approximately 5:15 p.m., while at the predetermined meet location, TFO Kopatich retrieved the controlled substances from CS 3. Subsequently, SA Kazamias retrieved the live feed audio/video recording device from CS 3. CS 3 was searched for contraband with

negative results. Additionally, TFO Ronsman searched CS 3's vehicle for money, contraband, and controlled substances, with negative results. When searched for money, CS 3 had $68.00 USC OAF remaining at the conclusion of the controlled buy.

69. A post-operational debrief was conducted with CS 3. During the debrief, CS 3 reported that:

a. CS 3 contacted LEE prior to CS 3 arriving in Milwaukee. Prior to CS 3's arrival, LEE had not made contact with any of the drug suppliers. LEE directed CS 3 to 320 N. 32nd Street where LEE was currently staying.

b. Upon CS 3's arrival, CS 3 entered a pop-up camper where LEE and a female known only as Marie, were located. Shortly after arriving, LEE told CS 3 that they need to go back to the house on Burleigh (I believe this to be 2614 W. Burleigh Street) where the "down" (purple fentanyl) would be delivered.

c. CS 3 and LEE were at the residence on Burleigh for approximately 30 minutes before LEE made a call to "Short Bust" (who I believe to Pierre SMITH) and requested two ounces of "down" (purple fentanyl) for CS 3.

d. When "Short Bust" (I believe to be SMITH) eventually arrived, CS 3 and LEE walked down the front stairs towards the front door. CS 3 handed LEE the money for the fentanyl while they were walking downstairs. CS 3 and LEE both exited the front door with the intent of both CS 3 and LEE getting into the vehicle that was parked on the street. CS 3 walked towards the vehicle and noted that the vehicle was full as it now contained LEE, "Short Bust" (I believe to be

SMITH), and two other unknown persons. CS 3 went back into the residence. NOTE: The arrival of the black vehicle (Maserati), LEE and CS 3 exiting the front door, and CS 3 going back into residence, is consistent with the observations made by surveillance units on scene as well as video evidence obtained.

e. After CS 3 obtained the fentanyl from LEE, which LEE retrieved from his pants pocket while back in the residence, LEE began unpacking personal belongings that LEE had brought to the residence. A short time later, LEE said that they (meaning LEE and CS 3) would need to go back to the camper on N 32nd Street in order to obtain the requested meth. CS 3, LEE and the female (known to CS 3 only as Marie) got back into CS 3's vehicle and drove back to the camper.

f. While at the camper, another male and female arrived and met with LEE. LEE made a call to someone (according to CS 3 this call was most likely to the person I believe to be SMITH), and ordered another ounce of fentanyl for the male and female. At one point, LEE exited the camper and came back very quickly with the fentanyl.

g. While in the camper, LEE received a message from the "Mexican" (believed by CS 3 to be LEE's meth source) informing LEE that he had a flat tire and that LEE and CS 3 would have to come to him to get the meth. CS 3 and LEE were directed to an area on the south side of Milwaukee where CS 3 and LEE parked on the roadway. Shortly after they arrived, the meth source pulled up behind the vehicle containing CS 3 and LEE. LEE exited and got into the van that the

meth source was operating. The van the meth source was driving then pulled in front of the car containing CS 3 and parked. LEE exited the van and got back into CS 3's vehicle with the meth in his coat pocket. LEE subsequently gave the meth to CS 3. CS 3 and LEE drove back to the camper where LEE was dropped off.

70. TFO Kopatich later reviewed the covertly recovered video made by CS 3 during the above-described transactions. Said video generally corroborates the information provided by CS 3 about what occurred during CS 3's purchase of fentanyl and methamphetamine from LEE. Specifically, the video shows LEE and CS 3 walking down the stairs at 2614 W. Burleigh Street when the fentanyl source of supply (believed to be SMITH) arrives. Shortly thereafter, the video shows CS 3 and LEE going outside and LEE walking towards the Maserati, as witnessed by investigators on surveillance. The video then shows CS 3 going back into the residence and, a short time later, meeting with LEE. The video goes on to show LEE and CS 3 getting back into CS 3's vehicle and traveling to 320 N. 32nd Street. Shortly after arriving at 320 N. 32nd Street the audio and video battery failed.

71. Based on my training and experience, the investigation to date, CS 3's statements, and the corroboration of those statement provided by law enforcement surveillance, the GPS data for the subject vehicle, and the covertly recorded video of the December controlled buy, I believe that SMITH likely supplied LEE with fentanyl and that GONZALEZ likely supplied LEE with methamphetamine and that LEE provided both substances to CS 3.

**Brown County Fatal Overdose Investigation**

72. Through investigative deconfliction, case agents learned that LEE is a person of interest in a fatal controlled substance overdose in Brown County, Wisconsin. On October 23, 2025, law enforcement responded to a suspected overdose death of H.R.S. in the Township of New Denmark, Brown County, Wisconsin. Evidence located on scene combined with the prior history of the victim led investigators to believe that the death of H.R.S. was related to an overdose. Dr. Douglas of the Brown County Medical Examiner's Office listed the cause of death for H.R.S. as the toxic effects of fentanyl and methamphetamine.

73. Digital evidence and location data was obtained from multiple cell phone downloads as well as other investigatory techniques. Intelligence was gathered through several witness interviews. The combination of all of the evidence and intelligence that was gathered throughout this investigation shows that on October 22, 2025, J.J.G. and S.J.M. traveled to 320 N. 32nd Street in the City of Milwaukee where they obtained an unknown of amount of fentanyl that was purple in color from LEE AKA "Luffy." J.J.G. and S.J.M. then returned to Brown County with that fentanyl. Upon returning to Brown County they met with the victim, H.R.S. J.J.G. and S.J.M. distributed the fentanyl to the victim, H.R.S., who ingested that fentanyl, causing their death.

**Arrest of Kue LEE**

74. Case agents conducted a wanted check of LEE and found that he was currently wanted by the Wisconsin Department of Corrections for violating the terms and conditions of his extended supervision regarding Sheboygan County case# 2017CF000049 (Possession of methamphetamine) and Outagamie County case# 2021CF001259 (Burglary).

75. On December 11, 2025, members of law enforcement went to 320 North 32nd Street in an attempt to locate and arrest LEE. Officers knocked on the door for the residence and were allowed in to search for LEE. LEE was observed in the living room and taken into custody.

76. Officers conducted a search incident to arrest of LEE. Located in LEE's left pant pocket was a blue Samsung touchscreen smart phone. In LEE's front right pant pocket was a clear plastic bag that contained a purple powder that was suspected to be fentanyl. LEE was transported to the Milwaukee Secure Detention Facility for processing. TFO Kopatich later subjected the suspected controlled substance to a presumptive field test that tests for the presence of fentanyl. The sample tested positive for the presence of fentanyl and had a total weight of 1.4 grams.

**December 2025 Interview with CS 2**

77. In December 2025, case agents conducted a follow up debrief of CS 2. CS 2 stated that GONZALEZ still utilizes Target Cell Phone 1. CS 2 stated that GONZALEZ had been utilizing 262-900-2014 (a prior phone number that CS 2 knew GONZALEZ to have used before and during CS 2's present period of incarceration and herein referred to as "Prior Phone 1") for controlled substance transactions. CS 2 reported that CS 2 has personally spoken with GONZALEZ at Prior Phone 1 in the past. However, CS 2 stated that GONZALEZ no longer utilizes Prior Phone 1 and now utilizes a phone with phone number 414-294-9815 ("Target Cell Phone 2"). CS 2 obtained this information from an associate of CS 2 who, in turn, told CS 2 that they got the information from third party known by CS 2 to be acquainted with GONZALEZ. CS 2 does not have personal knowledge of GONZALEZ's use of Target Cell Phone 2 and has never contacted GONZALEZ at that number.

78. In December 2025, your affiant reviewed subscriber information for Target Cell Phone 2. Subscriber results from Verizon listed an unknown subscriber.

79. During the in-person interview of CS 2 in December 2025, I showed CS 2 a WI DOT photograph of LEE. Without hesitation or prompting, CS 2 positively identified LEE as "Fire Boy," one of the individuals to whom CS 2 would sell methamphetamine that CS 2 obtained from GONZALEZ.

**Toll Analysis Between Prior Phone 1 and Target Cell Phone 2**

80. TFO GREGORY found that the phone carrier for both Prior Phone 1 and Target Cell Phone 2 is Verizon. TFO GREGORY served a subpoena upon Verizon to receive call detail records for each cell phone. Through analysis, TFO GREGORY found similarities in the call data for each phone.

81. An analysis of telephone records for Target Cell Phone 2 from November 13, 2025 to December 14, 2025, revealed that Target Cell Phone 2 was in contact with a total of 33 unique phone numbers. Out of those 33 unique phone numbers, 6 phones numbers (18%) also were in contact with Prior Phone 1. The analysis also showed a total number of 448 calls and text messages over Target Cell Phone 2 during the time period analyzed. Out of those 448 calls and text messages over Target Cell Phone 2, 67 calls and text messages (14%) were with phones that were also in contact with Prior Phone 1.

82. Investigators note that Target Cell Phone 2 had 293 contacts with 414-398-5706 which has been identified as belonging to Kue LEE through CS 3 and the controlled

transactions. This amount of contacts accounts for 65.4% of all calls for Target Cell Phone 2 during the time period analyzed. 414-398-5706 was not in contact with Prior Phone 1.

83. When investigators conducted a secondary analysis of the telephone records for Target Cell Phone 2 from November 13, 2025 through December 14, 2025 with numbers *other* than 414-398-5706 (believed to be LEE), said analysis showed a total number of 155 calls and text messages over Target Cell Phone 2. Out of those 155 calls/messages, 67 calls and text messages (43%) were with phones that were also in contact with Prior Phone 1.

84. Based on the foregoing, TFO GREGORY believed that GONZALEZ is using Target Cell Phone 2 as a replacement phone for Prior Phone 1. The last known outgoing contact of Prior Phone 1 occurred on November 24, 2025. It appears that Target Cell Phone 2 began being used on or about November 13, 2025.

85. Through CS 3's information, case agents learned that LEE's phone number is 414-398-5706. TFO GREGORY found the cell phone carrier for 414-398-5706 is AT&T. TFO GREGORY served AT&T a subpoena to receive call data records (CDR). Upon the receipt of those records, TFO GREGORY analyzed the data centered around the dates of the aforementioned controlled buys: November 11, 2025 and December 9, 2025.

86. From reviewing call data from November 19, 2025, LEE's device received a call from Target Cell Phone 2 at 5:38PM and 5:39PM. From reviewing the reports surrounding the controlled purchase on November 19, 2025, case agents observed GONZALEZ's Honda Odyssey arrive in the area of North 31st Street and West St. Paul Avenue at approximately 5:40PM. Based upon the timing of the calls from Target Cell Phone 2 to LEE's device and the arrival of the Honda

Odyssey, TFO GREGORY believe that GONZALEZ used Target Cell Phone 2 and contacted LEE to advise LEE that GONZALEZ was arriving to supply the methamphetamine.

87. From reviewing call data from December 9, 2025, TFO GREGORY learned that LEE's device and Target Telephone 2 were in contact five different times that day. At 4:24PM and 4:29PM, LEE's device called Target Telephone 2. From reviewing the reports surrounding the controlled purchase on December 9, 2025, case agents observed LEE and CS 3 leave the area of North 31st Street and West St. Paul Avenue at approximately 4:35PM. They then immediately traveled to the area of South 20th Street and West National Avenue. Case agents then observed the Honda Odyssey arrive at the location and observed LEE enter the vehicle. Based on the timing of the phone calls and case agents observing LEE and CS 3 leave to meet with the Honda Odyssey, TFO GREGORY believe that GONZALEZ used Target Cell Phone 2 to speak with LEE to advise LEE where to meet GONZALEZ for GONZALEZ to supply the methamphetamine.

88. The data reviewed from LEE's cell phone is from October 30, 2025 to December 15, 2025. Between those dates, there were 465 contacts between LEE's device and Target Cell Phone 2. As previously stated, LEE was arrested on December 11, 2025. On December 14, 2025 and December 15, 2025, Target Cell Phone 2 called LEE's device seven times. Based on this data, TFO GREGORY believe that GONZALEZ did not yet know that LEE was in custody.

89. TFO GREGORY reviewed further call detail records for Target Cell Phone 2 and TFO GREGORY located two known associates of GONZALEZ in contact with Target Cell Phone 2. These associates are Frank MITCHEM and Krizia DAVILA-LOPEZ.

90. As previously detailed in this affidavit, MITCHEM is involved with the warehouse located at 3002 West Burleigh Street. Target Cell Phone 2 was in contact with MITCHEM (262-353-0301) on 8 different occasions.

91. During the investigation, TFO GREGORY served subpoenas upon Wisconsin Energies to receive utility holder information. TFO GREGORY specifically asked for utility accounts that are under “Rehab Better Homes LLC” the LLC for which GONZALEZ is listed as a registered agent. TFO GREGORY found that there are two addresses with the utility holder being “Rehab Better Homes LLC”. GONZALEZ is listed as the owner on the utility information and DAVILA-LOPEZ is listed as the “secretary.” Target Cell Phone 2 was in contact with DAVILA-LOPEZ (262-751-2323) on 2 different occasions.

92. TFO GREGORY further analyzed call detail records data between Target Cell Phone 1 and Target Cell Phone 2. TFO GREGORY found one common contact between the two phone numbers. This phone number is 414-807-3988. Target Cell Phone 1 was in contact with x3988 on 35 occasions between September 6, 2025 and September 28, 2025. Target Cell Phone 2 has one contact with x3988 on November 17, 2025. Through a CashApp search, TFO GREGORY found x3988 to be associated with a “Michael Terry.” Michael Terry is not a person known to me or known to be otherwise involved in this investigation.

**Surveillance conducted on Miguel GONZALEZ on January 6, 2026**

93. On Tuesday, January 6, 2026, TFO Robert GREGORY, TFO Joseph ESQUEDA, and WI State Trooper Gareth SEDGBEER-WILLIAMS conducted surveillance on the residence of 738 S. 23rd Street in Milwaukee, Wisconsin (Target Residence 1). Case agents were aware that

this residence was associated with GONZALEZ. During this surveillance, case agents were monitoring the PRTT/ping installed on Target Cell Phone 2, which indicated that Target Cell Phone 2 was in the general vicinity of 738 S. 23rd Street (Target Residence 1). This led case agents to believe that GONZALEZ was at the residence (Target Residence 1). TFO GREGORY, TFO ESQUEDA, and Trooper SEDGBEER-WILLIAMS positioned themselves around 736 S. 23rd St and 738 S. 23rd Street (Target Residence 1) for surveillance purposes. At approximately 12:10pm, a black Jeep Grand Cherokee SUV (the "Jeep") bearing Wisconsin Registration Plate No. BCC-9472 arrived and parked behind the duplex, 736 S. 23rd Street and 738 S. 23rd Street (Target Residence 1). An unknown Hispanic male ("UHM") exited the driver seat of the Jeep and was allowed inside rear entry door for 736 S 23rd Street and 738 S. 23rd Street (Target Residence 1) via the rear door. At 12:51pm, UHM and GONZALEZ exited the same rear door for 736 S. 23rd Street and 738 S. 23rd Street (Target Residence 1) and walked to the Jeep. UHM entered the driver seat while GONZALEZ entered the front passenger seat. The Jeep then left the area followed by case agents. During the follow of the Jeep, case agents monitored the data provided by the PRTT/ ping installed on Target Cell Phone 2 which revealed that Target Cell Phone 2's approximate location was consistent with the path of travel of the Jeep leading me to conclude that that Target Cell Phone 2 was likely inside the Jeep. Case agents briefly lost sight of the Jeep, but utilizing the data provided by the PRTT, case agents located the Jeep parked in the parking lot for the Wisconsin Department of Motor Vehicle (DMV) located at 2701 S. Chase Avenue. TFO GREGORY entered the DMV and observed UHM and GONZALEZ inside the DMV.

94. Based on surveillance coupled with the data provided by the PRTT/ ping installed on Target Cell Phone 2, I believe that GONZALEZ was in possession of Target Cell Phone 2 when

he entered the Jeep at his residence (738 S. 23rd Street/Target Residence 1) and drove to the WI DMV (2701 S. Chase Avenue).

95. On January 12, 2026, the Honorable Nancy JOSEPH, Magistrate Judge for the Eastern District of Wisconsin, approved the search warrant to retrieve the data from the iCloud account assigned to Target Cell Phone 2 / TARGET ACCOUNT. Case agents have not yet received the results from Apple.

**Mitsubishi Outlander Identified**

96. On Tuesday, December 16, 2025, TFO Robert GREGORY conducted surveillance at the duplex, 736 S. 23rd Street and 738 S. 23rd Street (Target Residence 1). While at this location, TFO GREGORY observed a white Mitsubishi Outlander SUV with black & silver grid-style roof rack and an attached cargo carrier parked behind the location (Target Residence 1). Case agents are aware Miguel GONZALEZ has previously titled vehicles under his business identified as "Rehab Better Home LLC." Case agents conducted an open search of the Wisconsin Department of Transportation (WI DOT) for all the vehicles titled under "Rehab Better Home LLC" and discovered a white Mitsubishi Outlander SUV was assigned to Wisconsin Registration Temporary Plate No. E7717EE and a Wisconsin Registration Plate No. BCL-9975.

97. Case agents obtained sale documentation for the white Mitsubishi Outlander SUV. The vehicle was sold to Rehab Better Homes LLC from 24Hr Towing & Recovery Inc. The phone number listed for Rehab Better Homes LLC was 414-807-0753, which case agents were aware was utilized by GONZALEZ. Within the same documents, case agents located the "Vehicle

Transfer and Odometer Mileage Statement." The printed and signed name for the purchaser was "Miguel Gonzalez".

98. Case agents conducted a nationwide Automated License Plate Reader (ALPR) check of Wisconsin Registration Plate No. E7717EE and discovered the vehicle was spotted on December 11, 2025 at approximately 9:55am CST traveling westbound on Interstate (I) 80 through Aurora, Nebraska. The vehicle was again spotted on ALPR on December 11, 2025 at approximately 11:56am, on traveling westbound on I-80 through Gothenburg, Nebraska. On both occasions on this date, the vehicle was spotted carrying a black grid-style roof rack. The vehicle was next spotted on ALPR on December 15, 2025 at approximately 12:10pm CST, traveling northbound on I-90 in Rockford, Illinois. On this occasion, the vehicle had a black & silver luggage carrier attached to the roof rack, which is the same container TFO GREOGRY observed on December 16, 2025.

99. From case agents' knowledge of the investigation, case agents know that GONZALEZ is involved in trafficking of controlled substances. Based on a previous seizure of illicit drugs and debriefs, case agents know that these controlled substances are obtained from California. Case agents also know that drug traffickers use a multitude of methods to transport controlled substances from source states (such as California) to their final destination. These methods include: delivery through the mail, flown on an airplane, and transported on a train or motor vehicle. Based on this knowledge, and the knowledge of the investigation, case agents believe that the Mitsubishi Outlander's December 2025 trip is consistent with obtaining controlled substances from California and transporting them to Milwaukee. Case agents were aware this was

the second time that a vehicle registered to Rehab Better Home LLC was spotted on ALPR driving across the United States.

100. The affiant reviewed data provided the PRTT/ping installed on Target Cell Phone 2, which showed the cellular device left Milwaukee on December 10, 2025, at approximately 11:47pm, and traveled to Los Angeles, California arriving on December 12, 2025, at approximately 7:41am. TFO ESQUEDA compared the location data of Target Cell Phone 2 to the ALPR hits mentioned above and discovered that Target Cell Phone 2 and the Mitsubishi Outlander SUV were in the same general location at the same general times on both the trip westbound and the return trip. This led TFO ESQUEDA to believe GONZALEZ was in the Mitsubishi Outlander SUV as it traveled from Milwaukee to Los Angeles and back to Milwaukee. Location data for Target Cell Phone 2 showed that the device began travelled back east towards Milwaukee on December 14, 2025 and the device arrived in the general vicinity of Target Residence 1 on December 15, 2025 at approximately 1:23pm. Location data for Target Telephone 2 showed that the device later hit off a cell tower that covers the general area that includes 2936 W. Wells Street, #204 (Target Residence 2) but the precise device location is unknown.

101. Based on my training and experience, my review of the ALPR data for the Mitsubishi Outlander and phone location data for Target Cell Phone 2, I believe that GONZALEZ travelled to California in the Mitsubishi Outlander to obtain controlled substances on or about December 12, 2025, and then travelled back to Milwaukee with the drugs concealed within the roof storage compartment. I believe that GONZALEZ arrived back in Milwaukee with the drugs on December 15, 2025. The location data for Target Cell Phone 2 showed that the device was in

the general area of Target Residence 1 on December 15, 2025 and TFO GREGORY observed the Mitsubishi Outlander parked at Target Residence 1 on December 16, 2025.

**Identified 2936 W. Wells Street, Apartment No. 204 (Target Residence 2)**

102. On December 10, 2025, TFO GREGORY served a subpoena to WE Energies requesting all utility account under Rehab Better Homes LLC. Case agents were aware GONZALEZ was the registered agent of that LLC. On December 11th, 2025, WE Energies responded that Rehab Better Homes LLC was the current utility holder for 2936 W. Wells Street, Apartment No. 204 in the City and County of Milwaukee (Target Residence 2). The phone number listed was 414-807-0753 (Target Cell Phone 1).

103. The affiant reviewed the data for the PRTT/ping installed on Target Cell Phone 2 for the past thirty (30) days. The data showed that Target Cell Phone 2 was in the immediate vicinity of 2936 W. Wells Street (Target Residence 2) on at least twenty (20) occasions with two (2) the occasions extending overnight into the next morning.

**Convert Camera Install / Apartment No. 204 Entry Door**

104. On December 16, 2025, TFO GREGORY, TFO ESQUEDA, and Milwaukee Police Officer Jose MEDINA responded to 2936 W. Wells Street (Target Residence 2) and installed a covert camera in the hallway, outside of Apartment No. 204 with the consent of the property owner. The camera is not constantly recording but rather is motion and heat activated. The camera was installed in a manner to view the entry door of Apartment No. 204 (Target Residence 2) but not the interior of the apartment.

105. When case agents were installing the covert camera, the affiant took note that the doorknob and deadbolt locks to each apartment door in the building were the same color (gray) and design, likely the same brand. This is to have a uniformed look and so the apartment owners and / or management can easily access the apartment through a spare key and / or to easily replace the locks if needed.

106. The affiant took note the deadbolt lock to the entry door to Apartment No. 204 (Target Residence 2) was a different color (black) then the deadbolt locks on the entry doors to the other apartments. This led case agents to believe GONZALEZ changed the deadbolt lock so only he had control of who accessed the apartment and not the apartment owners and/or management team. Based on my training and experience, I believe this is consistent with GONZALEZ using Target Residence 2 as a stash location to store drugs and other contraband—items that he would not want anyone else to have access to and that he would want to have exclusive control over

107. On December 19, 2025, DEA TFO Christopher NAVARETTE and Officer MEDINA retrieved the covert camera to review the recorded videos.

108. Trooper SEDGBEER-WILLIAMS reviewed the recorded videos and found the following to be pertinent to the investigation: on December 18, 2025 at or about 7:53am, the recording device captured GONZALEZ and an unidentified Hispanic male approach the entry door of Apartment No. 204 (Target Residence 2), and GONZALEZ entering the apartment (Target Residence 2). At or about 8:39am, the recording device captured the unidentified Hispanic male standing in the hallway, outside of the apartment and GONZALEZ exiting the apartment (Target Residence 2) and locking the door behind him. At or about 11:10am, GONZALEZ and the unidentified Hispanic male return to Apartment No. 204 (Target Residence 2) carrying items and

boxes. GONZALEZ used keys to unlock the entry door before entering the dwelling (Target Residence 2).

109. On December 29, 2025, TFO GREGORY and Trooper SEDGBEER-WILLIAMS were monitoring the PRTT/ping installed on Target Cell Phone 2 and discovered the cellular device was in the vicinity of 2936 W. Wells Street (the building containing Target Residence 2) at 11:00am. Case agents were aware that GONZALEZ was associated to Apartment No. 204 (Target Residence 2).

110. On December 30, 2025, Milwaukee Police Officer Jose MEDINA, TFO GREGORY, and Trooper SEDGBEER-WILLIAMS responded to 2936 W. Wells Street and installed a covert camera in the hallway, outside of Apartment No. 204 (Target Residence 2) with the consent of the property owner. The camera is not constantly recording but rather is motion and heat activated. The camera was installed in a manner to view the entry door of Apartment No. 204 but not the interior of the dwelling.

111. TFO GREGORY then reviewed data provided by the PRTT/ping installed on Target Cell Phone 2 and discovered the location of the cellular device was in the vicinity of 2936 W. Wells Street (the building containing Target Residence 2) which led him to believe that GONZALEZ was inside the apartment (Target Residence 2) at the time of the covert camera was installed. On January 5, 2026, Officer MEDINA, TFO GREGORY, and Trooper SEDGBEER-WILLIAMS retrieved the covert camera to review the recorded videos.

112. TFO GREGORY reviewed the recorded videos and found the following to be pertinent to the investigation: on December 31, 2025, at or about 2:20pm, GONZALEZ exited

Apartment No. 204 (Target Residence 2) with an unidentified male, GONZALEZ locked the entry door, and left the apartment building.

**Stash Location**

113. Case agents are aware entrenched drug trafficker will often compartmentalize their drug trafficking operation in an effort to hinder law enforcement investigations and minimize their exposure during law enforcement intervention. Specifically, case agents are aware entrenched drug trafficker will use separate residences to store the bulk of their drugs and / or money separate the residence that they meet and deal to their drug customers and / or reside. Based on the facts mentioned previously in this affidavit showing that GONZALEZ is an established drug trafficker, the recorded videos of GONZALEZ accessing 2936 W. Wells Street, Apartment No. 204 (Target Residence 2) and the PRTT/ping data from Target Cell Phone 2 demonstrating that GONZALEZ frequents Target Residence 2 during various times throughout the day but rarely staying overnight, I believe that GONZALEZ was maintaining Target Residence 2 as a "stash location."

**January California Trip**

114. On January 6, 2026, case agents conducted nationwide ALPR check Wisconsin Registration Plate No. BCL-9975, which is registered to the white Mitsubishi Outlander SUV as mentioned previously in this affidavit. The following results were found pertinent to the investigation:

a. January 4, 2026 at 6:27am CST, the vehicle was traveling westbound on I-80 through Omaha, Nebraska.

b. January 4, 2026 at 6:44am CST the vehicle was located traveling westbound in I-80 through Gretna, Nebraska.

c. January 4, 2026 at 7:13am CST, the vehicle was traveling westbound on I-80 through Lincoln, Nebraska.

d. January 4, 2026 at 8:05am CST, the vehicle was traveling westbound on I-80 through Aurora, Nebraska.

e. January 4, 2026, at 9:53am CST, the vehicle was traveling westbound on I-80 through Gothenburg, Nebraska.

f. January 4, 2026 at 4:30pm CST, the vehicle was traveling westbound on I-70 through Debque, Colorado.

g. January 4, 2026 at 5:10pm CST, the vehicle was traveling westbound on I-70 through Loma, Colorado.

h. January 4, 2026 at 11:23pm CST, the vehicle was traveling southbound on I-15 near Craig Road exit in Las Vegas, Nevada.

i. January 4, 2026 at 11:52pm CST, the vehicle was traveling southbound on I-15 near the Town of Jean, Nevada

j. January 5, 2026 at 3:21pm CST, the vehicle was traveling westbound through el Segundo Blvd and Isis Ave in Hawthrone, California.

115. Based on the investigation mentioned previously in this affidavit, case agents believe this trip was consistent with the trip in December 2025 and involved the Mitsubishi

Outlander travelling to California to obtain controlled substances to deliver to GONZALEZ. It should be noted that location data for Target Cell Phone 2 showed that the device remained in the Milwaukee area during the above times and, therefore, case agents did not believe that GONZALEZ personally made the trip to California.

**Traffic Stop**

116. On January 12, 2026, law enforcement officers were made aware through nationwide ALPR that the Mitsubishi Outlander SUV was traveling eastbound on I-80 through Lancaster County, Nebraska. Based on my training and experience, and the overall investigation, I believed that the Mitsubishi Outlander had obtained controlled substances in California and was enroute back to Milwaukee.

117. Case agents were made aware that on January 12, 2026, at approximately 2:25pm, Lancaster County Sheriff Deputy NEEDHAM conducted a traffic stop of the white Mitsubishi Outlander SUV between Mile Marker (MM) 405 – 408 on I-80 Eastbound for multiple traffic violations. The driver was identified by his WI driver's license as Fransisco CRESPO-TRINIDAD. During the traffic stop, law enforcement officers could smell the odor of marijuana emanating from the interior of the vehicle. Furthermore, CRESPO-TRINIDAD gave an inconsistent story concerning his travel plans. Law enforcement officers conducted a probable search of the vehicle and located 6.10 gram of marijuana in the glovebox and 19.80 pounds of cocaine in the roof rack cargo container. During the investigation, CRESPO-TRINIDAD identified his phone number as 414-208-8701.

118. Case agents reviewed the data provided by the PRTT installed on Target Cell Phone 2 and discovered CRESPO-TRINIDAD's phone number contacted Target Cell Phone 2 at 2:24pm on January 12, 2026, with a call duration of 21 seconds. This led case agents to believe CRESPO-TRINIDAD contacted GONZALEZ to advise GONZALEZ that CRESPO-TRINIDAD was being pulled over by law enforcement. Case agents are aware this is a common tactic for drug couriers (such as CRESPO-TRINIDAD) to inform their co-conspirator (such as GONZALEZ) of law enforcement intervention.

119. Furthermore, the PRTT and ping for Target Cell Phone 2 revealed the following pertinent information:

a. 2:16pm Target Cell Phone 2 was within the vicinity of 738 S. 23rd Street (Target Residence 1);

b. 2:24pm, CRESPO-TRINIDAD contacted Target Cell Phone 2

c. 2:31pm, Target Cell Phone 2 was within the vicinity of 738 S. 23rd Street (Target Residence 1);

d. 2:46pm, Target Cell Phone 2 was within the vicinity of S. 27th Street and W. National Avenue.

e. 3:02pm, Target Cell Phone 2 was within the vicinity of 2936 W. Wells Street (the building containing Target Residence 2)

f. 3:15pm, Target Cell Phone 2 was within the vicinity of I-94 at W. National Avenue, where it remained

g. 4:00pm, Target Cell Phone 2 was within the vicinity of 738 S. 23rd Street, his residence (Target Residence 1).

120. Based on the totality of the investigation, and my training and experience, I believe CRESPO-TRINIDAD was driving to California to pick up the six kilograms of cocaine on behalf of GONZALEZ. I believe that when CRESPO-TRINIDAD was being stopped by law enforcement, he contacted GONZALEZ to alert him of the stop. I believe that GONZALEZ then departed from Target Residence 1, travelled to Target Residence 2, and eventually returned to Target Residence 1.

121. TFO GREGORY spoke to the law enforcement officers involved in the traffic stop of the Mitsubishi Outlander and the arrest of CRESPO-TRINIDAD. The law enforcement officers stated during the traffic stop, they took note that the cellular device recovered from CRESPO-TRINIDAD was receiving multiple WhatsApp phone calls from Target Cell Phone 2. I believe that these calls were made by GONZALEZ in response to the phone call CRESPO-TRINIDAD made to GONZALEZ at 2:24pm to alert him (GONZALEZ) of traffic stop.

122. TFO GREGORY and TFO ESQUEDA reviewed a booking photograph of CRESPO-TRINIDAD that was captured on January 12, 2026 and positively identified him as UHM in the surveillance episode conducted on January 6, 2026 and mentioned previously in this affidavit. Specifically, that CRESPO-TRINIDAD was the male who accompanied GONZALEZ from the area of Target Residence 1 and travelled to the DMV. I believe this further demonstrates the connection between CRESPO-TRINIDAD and GONZALEZ.

**Arrest of GONZALEZ**

123. Case agents were aware GONZALEZ had a felony warrant for his arrest with the Department of Community Corrections (DOCC). I was aware on January 13, 2026, law enforcement officers assigned to the Fugitive Task Force (FTF) and HIDTA responded to 738 S. 23rd Street (Target Residence 1) to locate and arrest GONZALEZ. Once at the location, FTF knocked on the rear exterior entry door of Target Residence 1 and made multiple announcements identifying themselves as law enforcement and that GONZALEZ had a warrant for his arrest and to show himself. After not getting a response, FTF breached the rear exterior door, which led into the common hallway for Target Residence 1 (Lower Unit) and 736 S. 23rd Street (Upper Unit). FTF knocked on the interior rear door for Target Residence 1 and made multiple announcements identifying themselves as law enforcement and that GONZALEZ had a warrant for his arrest and to show himself. After not receiving an answer, FTF began to breach the interior rear door of Target Residence 1. As this occurred, GONZALEZ tried to evade FTF by fleeing out the front entry door to Target Residence 1. Law enforcement officers assigned to containment observed GONZALEZ exiting the front entry door of Target Residence 1 and took him into custody.

124. A search of GONZALEZ following his arrest revealed that he was in possession of a black Apple iPhone (with no case) with a sticker on the back with a handwritten note, "414)293-7395" (**Device C**) and a large quantity of US currency. Law enforcement officers took custody of **Device C** and the US currency.

125. TFO ESQUEDA drafted residential search warrants for 738 S. 23rd **Street (Target Residence 1) and 2936 W. Wells Street (Target Residence 2).** The Honorable Nancy JOSEPH, Magistrate Judge for the Eastern District of Wisconsin, approved the residential search warrants for **Target Residence 1 and 2** on January 13, 2026, and they were executed that same day.

**Search Warrant Execution at 738 S. 23rd Street (Target Residence 1)**

126. I am aware that law enforcement officers executed a residential search warrant at 738 S. 23rd Street (Target Residence 1) on January 13, 2026, and located the following items of evidentiary value:

a. Black Apple iPhone with a blue & black protective case (**Device A**) was located in the hallway closet by the front entry door. It should be noted that GONZALEZ would have to walk through this area to access and exit the front entry door. USPIS Special Agent Tyler FINK called Target Cell Phone 2 (phone no. 414-294-9815). The black Apple iPhone (**Device A**) rang, which confirmed that **Device A** was Target Cell Phone 2;

b. Black Apple iPhone with a red protective case (**Device B**) was located in the master bedroom on top of the nightstand, next to the bed. It should be noted, Special Agent Tyler FINK and Trooper SEDGBEER-WILLIAMS interviewed GONZALEZ's live-in girlfriend, Anatalia RODRIGUEZ (XX/XX/1989), who showed up on scene to take custody of the children that were inside the residence. Anatalia RODRIGUEZ stated she lived at the residence with GONZALEZ and identified their bedroom as the master bedroom and that GONZALEZ stayed at that residence regularly. Based on the facts mentioned previously in this affidavit, coupled with the fact that GONZALEZ sleeps and has control in this bedroom, case agents believe that **Device B** belongs to GONZALEZ and /or he had access to **Device B**.

c. Black Springfield XD-40, semi-automatic handgun having serial no. XD500802 was located in the kitchen on the top shelf of the closet. I am aware from my review of GONZALEZ's criminal history that GONZALEZ is a convicted felon having been convicted in Milwaukee County case 22CF1314 of Fleeing/Eluding an Officer and 2nd Degree Recklessly Endangering Safety and Milwaukee County case 17CF411 of Possessing a Firearm as an Adjudicated Delinquent. By function of these convictions, I believe that GONZALEZ is prohibited from possessing firearms. Further, based on my training and experience, I know that drug traffickers often arm themselves with firearms in order to protect their illegal drugs and/or their drug proceeds. Based upon my training and experience, my knowledge of this investigation and the evidence recovered within Target Residence 1, I believe that GONZALEZ possessed this firearm in furtherance of his drug trafficking;

d. A money counter was located in the living on the bottom shelf of the entertainment center. Based on my training and experience, I know that drug trafficking generates a large amount of cash and that larger scale drug traffickers often possess money counters to assist in counting their illegal drug proceeds;

e. Digital gram scale with glass top, unfired ammunition, a knotted plastic bag of marijuana (12.83 grams) and a bank band for $2,000 were located in the kitchen inside a bag on top of the wall cabinet above the refrigerator. Based on my

training and experience, I know that digital gram scales are commonly used by drug traffickers in repackaging their drugs for resale;

f. Multiple unused commercial zip-top plastic bags were located in the kitchen. Based on my training and experience, I know that drug traffickers commonly use this type of packaging to repackage drugs, namely marijuana, for resale; and

g. An empty handgun magazine and multiple boxes of ammunition were located inside a black Michael Kohr's purse that was in master bedroom on the top shelf of the closet.

**Search Warrant Execution at 2936 W. Wells Street (Target Residence 2)**

127. I am aware that law enforcement officers executed a residential search warrant at 2936 W. Wells Street (Target Residence 2) on January 13, 2026. Law enforcement used keys recovered from the bedroom of 738 S. 23rd Street (Target Residence 1) to unlock the front entry door to 2936 W. Wells Street, Apartment No. 204. During the search, law enforcement officers located the following items of evidentiary value:

a. Black rifle stock was located in the living room on top of the couch;

b. Suspected drug ledger was located in the kitchen on top of the shelf in the closet;

c. A black Glock magazine was recovered from the top shelf of the closet in the bedroom;

d. Marijuana (25 grams) was located in the bedroom on the top shelf of the bedroom;.

e. A box of 5.56 ammunition was located in the bedroom on the top shelf of the bedroom;

f. State of Wisconsin Department of Corrections check listing Miguel GONZALEZ as the payee was located in the bedroom on the top shelf closet; and

g. Two (2) vehicle titles listing the owner as "Rehab Better Homes LLC", American Express document addressed to Miguel GONZALEZ, and an Associated Bank document addressed to Miguel GONZALEZ was located on the in the kitchen cabinet.

**Felony Conviction for GONZALEZ**

128. Case agents were aware Miguel GONZALEZ had multiple felony convictions (see below), which prohibit him from possession and / or constructively possession a firearm:

a. Milwaukee County Circuit Court Case No. 2022CF1314 (Vehicle Operator Flee Elude, a class I felony, Wisconsin Statutes 346.04(3); 2nd Degree Recklessly Endangering Safety, a class G felony, Wisconsin Statutes 941.30(2); and

b. Milwaukee County Circuit Court Case No. 2017CF0411 (Possession of a Firearm by Adjudicated Delinquent of a Felony), a class G felony, Wisconsin Statutes 941.29(1m)(bm).

## CONCLUSION

129. Case agents believe GONZALEZ used his cell phones to facilitate drug trafficking and evidence of drug trafficking may likely be stored and recorded on **Devices A, B, and C**.

130. Through my training and experience, and discussions with other experienced law enforcement officers, I have found it incredibly common for individuals who possess firearms legally or illegally to often take or cause to be taken photographs and other visual depictions of themselves, their associates, and the firearms that they control, possess, buy and sell. These photographs and visual depictions are typically kept and maintained on their cellular devices and computers. I also found it incredibly common for individuals to use cellular telephones and computers to communicate orally or via electronic message in "text" format with individuals with whom they purchase, trade, or otherwise negotiate to obtain firearms.

131. Through my training, experience, and discussions with other experienced law enforcement officers, I am familiar with the ways in which drug traffickers and money launderers conduct their unlawful trade, including their methods of distribution, their use of communication devices, their use of coded communications to conduct their transactions, the employment of counter surveillance, their use of false or fictitious identities, and their use of various forms of electronic devices to store and/or conceal illegal activity.

132. Based upon my training and experience, I know that individuals involved in drug trafficking and money laundering frequently use cellular telephones to maintain contact and arrange transactions with their sources and customers of and co-conspirators in the distribution of

controlled substances and money laundering. I have also found it very common for crime suspects to use their cellular telephones to communicate aurally or via electronic message in "text" format with individuals whom they purchase, trade, or otherwise negotiate to obtain illegal drugs.

133. Based on my training and experience, I am aware individuals involved in trafficking controlled substances and money laundering often possess multiple cellular devices to compartmentalize their illegal activity and to avoid law enforcement detection.

134. Based upon my training and experience, I believe it is common for crime suspects who possess illegal controlled substances to often take or cause to be taken photographs and other visual depictions of themselves, their associates, and the illegal controlled substances and proceeds of drug trafficking. Furthermore, affiant believes it is common for these photographs and visual depictions to be kept and maintained on their cellular devices.

135. Based upon the facts described above, to include (1) my knowledge of and experience confirming the prolific use of electronic devices to facilitate the possession and trafficking of controlled substances and money laundering and the unlawful acquisition, possession, and use of firearms particularly in connection to drug trafficking; (2) Miguel GONZALEZ was found to be connected to a traffic stop in Nebraska where 19.8 pounds of cocaine were recovered mentioned previously in this affidavit; and (3) one cellular phone was recovered from his person and two cellular phones were recovered from Target Residence 1 (where a firearm was location along with evidence of drug trafficking such as digital scale and packaging material), one of them being Target Cell Phone 2; there is probable cause to believe that a search of the information contained within the above described **Devices** will produce evidence the Target Offenses.

136. **Devices A, B, and C** were seized by law enforcement officers assigned to HIDTA during the arrest of GONZALEZ and the search warrant execution at Target Residence 1 on January 13, 2026.

137. **Devices A**, **B**, **and C** are currently in storage at the North Central HIDTA office, 11548 W. Theo Trecker Way, West Allis, Wisconsin. In my training and experience, I know that **Devices A**, **B**, **and C** have been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when **Devices A**, **B**, **and C** first came into the possession of law enforcement.

138. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of **Devices A**, **B**, **and C,** as further described in Attachment A, to seek the items described in Attachment B.

## TECHNICAL TERMS

139. Based on my training and experience, I use the following technical terms to convey the following meanings:

a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments, or notes) and utilizing computer programs. Some PDAs also function as wireless communication

devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

h. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

140. Based on my training, experience, and research, I know that **Devices A**, **B**, **and C** have the capabilities that allow them to serve as a wireless telephone, digital camera, portable

media player, GPS navigation device, and PDA, and all have the ability to access the internet. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the devices.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

141. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

142. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes **Devices A**, **B**, **and C** were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on **Devices A**, **B**, **and C** because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).
b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.
c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.
d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore,

contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

143. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of **Devices A**, **B**, **and C** consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of **Devices A**, **B**, **and C** to human inspection in order to determine whether it is evidence described by the warrant.

144. *Manner of execution.* Because this warrant seeks only permission to examine the device once in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## ATTACHMENT A

**Property to Be Searched**

1. The property to be searched is described as follows:

   a. A black Apple iPhone smartphone with a blue & black protective case, hereinafter referred to as "**Device A**" that was seized on January 14, 2026 from GONZALEZ's residence (738 S. 23rd Street);

   b. A black Apple iPhone smartphone with a red protective case, hereinafter referred to as "**Device B**" that was seized on January 14, 2026 from GONZALEZ's residence (738 S. 23rd Street); and

   c. A black Apple iPhone smartphone (no case) with a sticker on the back with a handwritten note, "414)293-7395" hereinafter referred to as "**Device C"** that was seized from GONZALEZ's person on January 14, 2026 following his arrest in the area of GONZALEZ's residence (738 S. 23rd Street)

**Devices A, B,** and **C**, collectively referred to herein as the "**Devices**," are currently located at 11548 W. Theo Trecker Way, West Allis, Wisconsin. This warrant authorizes the forensic examination of the **Devices** for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1. All records on the **Devices,** further described in Attachment A, that relate to violations of 21 U.S.C. §§ 846, 843(b), and 841(a)(1), and 18 U.S.C., §§ 922(g) and 924(c), and involve Miguel GONZALEZ, including, but not limited to:

a. any documents and communications related to the Target Offenses;

b. lists of contacts and related identifying information;

c. types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

d. any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

e. any information related to criminal activity and co-conspirators (including names, addresses, phone numbers, or any other identifying information);

f. any information recording GONZALEZ's schedule or travel;

g. all bank records, checks, credit card bills, account information, and other financial records relevant to the acquisition, sale and/or trade of firearms, the sale/acquisition of controlled substances and/or drug proceeds;

h. Photographs and/or videos depicting evidence of the Target Offenses;

i. Any evidence related to either the ownership, purchase, or possession of items used in the Target Offenses;

j. Records of Internet activity, including browser history, search terms that the user entered into any Internet search engine, and records of user-typed web addresses

k. types, amounts, and prices of firearm transactions, as well as dates, places, and amounts of specific transactions;

l. any information related to the source(s) of firearms (including names, addresses, phone numbers, or any other identifying information);

m. any information related to GONZALEZ's acquisition, receipt, or possession of firearms during the time he has been prohibited by federal law from possessing firearms;

n. text messages, social media messages and content, SMS messages, iMessage data, relating to the acquisition, sale and/or trade of firearms and/or controlled substances; and

o. electronic mail to include the content of the emails, and associated email addresses, relating to the acquisition, sale and/or trade of firearms and/or controlled substances;

2. Evidence of user attribution showing who used or owned the **Devices** at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the HSI/HIDTA may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.